In the

# UNITED STATES COURT OF APPEALS

for the Seventh Circuit

## No. 25-1836

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**v.**

**WILLIAM FILLYAW,**

**Defendant-Appellant.**

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 23 CR 650 — Matthew F. Kennelly, *Judge*.

# BRIEF OF THE UNITED STATES

ANDREW S. BOUTROS
United States Attorney
for the Northern District of Illinois
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 353-5300

MICHELLE PETERSEN
Assistant United States Attorney
Chief of Appeals, Criminal Division

KIRSTEN MORAN
Assistant United States Attorney

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... ii

JURISDICTIONAL STATEMENT ..... 1

ISSUES PRESENTED FOR REVIEW ..... 1

STATEMENT OF THE CASE ..... 2

SUMMARY OF ARGUMENT ..... 17

ARGUMENT ..... 18

I. The District Court Did Not Err in Denying Defendant's Motion to Suppress. ..... 18

A. Standard of Review ..... 18

B. Analysis ..... 19

i. Law Enforcement Reasonably Impounded Defendant's Backpack Pursuant to Public Safety and Community Caretaking Considerations, and Because There Was No Alternative Opportunity for Its Speedy and Efficient Removal. ..... 19

ii. The Inventory Search Was Reasonable, Substantially Consistent with FBI Policy, and Not Done in Bad Faith. ..... 29

II. The District Court Did Not Abuse its Discretion in Denying Defendant's Motion to Reconsider. ..... 40

A. Standard of Review ..... 40

B. Analysis ..... 40

III. Defendant Waived the Argument that Law Enforcement Conducted an Unlawful Search of a License Plate Reader Database. ..... 44

A. Standard of Review ..... 44

B. Analysis ..... 44

CONCLUSION ..... 48

## TABLE OF AUTHORITIES

### CASES

*Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185 (7th Cir.1990) ........ 41, 43

*Burns v. First Am. Bank*, 2007 WL 141175 (N.D. Ill. Jan. 12, 2007) ........ 42

*Cabbler v. Superintendent, Virginia State Penitentia*ry, 528 F.2d 1142 (4th Cir 1975) ........ 24

*Central States, Southeast & Southwest Areas Pension Fund v. Reebie Storage & Moving Co., Inc.*, 1991 WL 105503 (N.D. Ill. June 10, 1991) ........ 42

*Colorado v. Bertine*, 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987) ........ *passim*

*F.D.I.C. v. Mahajan*, 2013 WL 3771419 (N.D. Ill. July 16, 2013) ........ 41

*Florida v. Wells*, 495 U.S. 1 (1990) ........ 20, 30

*Illinois v. Lafayette*, 462 U.S. 640 (1983) ........ 30, 31

*Russell v. Delco Remy Div. of General Motors Corp.*, 51 F.3d 746 (7th Cir.1995) ........ 41

*South Dakota v. Opperman*, 428 U.S. 364 (1976) ........ 30

*United Central Bank v. KMWC 845, LLC*, 800 F.3d 307 (7th Cir. 2015) ........ 40

*United States v. Black*, 2023 WL 5934911 (N.D. Ill. Sep. 12, 2023) ........ 27

*United States v. Braxton*, 61 F.4th 830 (10th Cir. 2023) ........ *passim*

*United States v. Cartwright*, 630 F.3d 610 (7th Cir. 2010) ........ *passim*

*United States v. Cherry*, 436 F.3d 769 (7th Cir. 2006) ........ 26

*United States v. Clinton*, 591 F.3d 968 (7th Cir. 2010) ........ 26, 28

*United States v. Duguay*, 93 F.3d 346 (7th Cir. 1996) ........ 19, 20, 21, 28

*United States v. Figueroa*, 622 F.3d 739 (7th Cir. 2010) ........ 45

*United States v. Foy*, 50 F.4th 616 (7th Cir. 2022) ........ 44

*United States v. French*, 291 F.3d 945 (7th Cir. 2002) .................................... 18

*United States v. Isaac Mallory*, 19 CR 857 (NSR), Dkt. 121 (S.D.N.Y. 2020) ..... ........................................................................................................ 32

*United States v. Jackson*, 189 F.3d 502 (7th Cir. 1999) ................................. 31

*United States v. Jackson*, 300 F.3d 740 (7th Cir. 2002) ................................. 18

*United States v. Jones*, 22 F. 4th 667 (7th Cir. 2022) ..................................... 18

*United States v. Kirkland*, 567 F.3d 316 (7th Cir. 2009) ................................. 44

*United States v. Lomeli*, 76 F.3d 146 (7th Cir. 1996) ................................ 30, 34

*United States v. McMillian*, 786 F.3d 630 (7th Cir. 2015) ............................. 45

*United States v. Perea*, 986 F.2d 633 (2d Cir. 1993) ...................................... 23

*United States v. Sanders*, 796 F.3d 1231 (10th Cir. 2015) ................. 26, 27, 41

*United States v. Scott*, 900 F.3d 972 (7th Cir. 2018) ...................................... 44

*United States v. Vick*, 145 F.4th 191 (1st Cir. 2025) ...................................... 24

*United States v. Wood*, 16 F.4th 529 (7th Cir. 2021) ................................ 44, 47

*Whren v. United States*, 517 U.S. 806 (1996) ................................................. 39

## STATUTES

18 U.S.C. § 844(h) ...................................................................................... 2

18 U.S.C. § 844(i) ....................................................................................... 2

18 U.S.C. § 922(g)(1) ............................................................................... 1, 4

18 U.S.C. § 924(c)(1)(A) ........................................................................... 1, 4

18 U.S.C. § 3231 .......................................................................................... 1

21 U.S.C. § 841(a)(1) ............................................................................... 1, 4

28 U.S.C. § 1291 .......................................................................................... 1

## JURISDICTIONAL STATEMENT

Defendant-Appellant's jurisdictional statement is not complete and correct. Defendant was charged with possession with intent to distribute a controlled substance, possession of a firearm in furtherance of a drug trafficking crime, and possession of ammunition by a felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(c)(1)(A) and 21 U.S.C. § 841(a)(1). R. 1.[1] Following a plea of guilty to possession with intent to distribute a controlled substance and possession of a firearm in furtherance of a drug trafficking crime, defendant was sentenced by the district court on May 9, 2025. R. 59. The district court's judgment and sentencing order was entered on the docket on May 15, 2025. R. 67. Defendant filed a timely notice of appeal on May 14, 2025. R. 62.

The district court had jurisdiction pursuant to 18 U.S.C. § 3231. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

1. Whether the district court erred in denying defendant's motion to suppress impoundment and an inventory search of defendant's backpack.

[1] The Original Electronic Record on appeal is designated as "R." followed by the district court document number. Government exhibits from the suppression hearing are designated as "Gov. Ex." followed by the exhibit number, and are found in the record at R. 18, 19. Defendant's brief, required short appendix, and appendix are designated as "Br." "S.App." and "App." respectively, followed by the page number (and line number, if applicable). The government's appendix is designated as "G. App.," followed by the page number.

2. Whether the district court abused its discretion in denying defendant's motion for reconsideration following the denial of his motion to suppress.

3. Whether defendant waived a Fourth Amendment suppression argument regarding the search of a license plate reader database.

## STATEMENT OF THE CASE

### *Offense Conduct*

On October 28, 2022, defendant William Fillyaw was arrested in Gurnee, Illinois, pursuant to an arrest warrant issued in the Eastern District of Wisconsin. R. 18 at 1. The arrest warrant was issued after Fillyaw was charged by criminal complaint with arson of a vehicle, in violation of 18 U.S.C. § 844(i) and use of arson in furtherance of another felony, in violation of 18 U.S.C. § 844(h). *Id*. The criminal complaint detailed an investigation into a homicide that occurred in Waukegan, Illinois on October 3, 2022, in which two subjects exited a gray Dodge Charger and discharged numerous rounds of ammunition into a victim's vehicle, killing him. *Id*. The gray Dodge Charger fled at a high rate of speed, and approximately less than 90 minutes later, a gray Dodge Charger was found empty and fully engulfed in flames in Pleasant Prairie, Wisconsin. *Id.* At the time of Fillyaw's arrest on October 28, 2022, Fillyaw was charged in a criminal complaint for arson of the Dodge Charger and use of arson in furtherance of another felony, namely, the homicide. *Id.*

At approximately 8:45 a.m. on the morning of Fillyaw's arrest, law enforcement observed Fillyaw drive a maroon van into the parking lot of his apartment complex in Gurnee. *Id*. Fillyaw retrieved a black backpack from the van, and began walking towards the entrance of the apartment building. *Id*. Law enforcement arrested Fillyaw, alone, while Fillyaw was in the parking lot of the residential building. *Id.* Fillyaw had the black backpack strapped to his back at the time of his arrest. *Id.* Law enforcement removed Fillyaw's backpack from his back approximately 25 seconds after law enforcement confronted him. *Id.* Approximately 8 seconds after that, law enforcement secured the handcuffs on defendant. *Id*. at 2. Less than two minutes after the backpack was removed, TFO Ploch opened the backpack, and recovered a PF940C Polymer 80 firearm with no serial number loaded with 14 rounds of 9-millimeter ammunition, 195.5 grams of cocaine, 373.8 grams of fentanyl, 489 grams of suspect marijuana, $9,436 in cash, ID and banking cards, and mail. *Id*; App. 262; R. 18-3; R. 18-4; R. 51. At the time of Fillyaw's arrest, law enforcement did not know which apartment Fillyaw lived in, and was not aware of the presence of any of Fillyaw's associates. R. 18 at 2.

Defendant was taken into custody based on the Eastern District of Wisconsin warrant and appeared before Magistrate Judge Stephen C. Dries on

October 31, 2022.[2] *Id.* Based on the items found in defendant's backpack, on December 19, 2023 defendant was charged in the Northern District of Illinois in a three count indictment with possession with intent to distribute 40 grams or more of fentanyl, in violation of 21 U.S.C. § 841(a)(1), possession of a gun in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A), and possession of ammunition as a felon, in violation of 18 U.S.C. § 922(g)(1). R. 18 at 2-3; R. 1.

***Motion to Suppress***

On April 26, 2024, defendant moved to suppress law enforcement's search of defendant's backpack pursuant to the Fourth Amendment. R. 16. In support of his motion, defendant argued that law enforcement needed a warrant or consent prior to opening a backpack that was on his person at the time of his arrest. *Id.*

The government argued in response that this was a routine, constitutional inventory search and in the alternative, would have been the subject of inevitable discovery. R. 18.

[2] On May 29, 2024, defendant pleaded guilty in the Eastern District of Wisconsin to accessory after the fact to transportation of a stolen vehicle in interstate commerce, and was sentenced to serve a 36-month term of imprisonment.

***Suppression Hearing***

On November 8, 2024, the district court held a hearing on the motion to suppress. Two law enforcement agents who participated in Fillyaw's arrest testified: Federal Bureau of Investigation Special Agent (SA) Jacob Dettmering and Federal Bureau of Investigation Task Force Officer (TFO) Brian Ploch. App. 213-285. Defendant presented one witness, his significant other, Sabrina Lynch. App. 285-297.

SA Dettmering testified first, explaining the specific events surrounding defendant's arrest. App. 215. SA Dettmering oversaw the arrest operation for defendant, which took place at approximately 8:45 a.m. on October 28, 2022, following defendant's arrival in a vehicle to an apartment complex in Gurnee, Illinois. App. 218; 225; 259. After law enforcement arrested defendant, SA Dettmering immediately removed defendant's backpack so he could place handcuffs on him. App. 221. At the time of the arrest, SA Dettmering's plan was to transport defendant "as soon as possible" to the United States Marshals in the Eastern District of Wisconsin because "[w]e were just going to transport him so that he could see the judge that day and get his appearance." App. 221-22. TFO Ploch confirmed his understanding of the same plan. App. 263.

TFO Ploch testified that within two minutes of law enforcement encountering defendant, he was handed defendant's backpack and began to walk to SA Dettmering's vehicle to prepare for defendant's transport. App. 261.

TFO Ploch testified that as he was walking to SA Dettmering's vehicle, he opened defendant's backpack. App. 261. Upon opening defendant's backpack, TFO Ploch observed a pair of jeans, and underneath the pants, a firearm and what appeared to be a bag of marijuana. App. 262.

After observing the contraband, TFO Ploch testified that he donned rubber gloves and called over FBI TFO Eulia Boyd (née Kazachenko) to retrieve a camera to document the items in the backpack. App. 263; 267. TFO Ploch testified that when he opened the bag and had it by SA Dettmering's vehicle, TFO Kazachenko arrived within "probably seconds." App. 284. TFO Ploch emptied defendant's backpack item-by-item and catalogued the items while in the residential parking lot, with TFO Kazachenko taking approximately 41 photos of the items as TFO Ploch lifted them out. App. 265; 268l R. 18-2. The items were logged into a photograph evidence log report, on form FD-674. App. 270; R. 18-3. Among the items contained in defendant's backpack were the firearm and narcotics that formed the basis of the charges in this case.

After cataloguing the items, TFO Ploch testified that he secured the backpack and its contents in SA Dettmering's vehicle. App. 270. SA Dettmering and TFO Ploch then transported the backpack to Waukegan Police Department. App. 232. Law enforcement also transported defendant to a patrol

car and took him away from the scene at approximately 9:06 a.m., about 20 minutes after they first encountered defendant. App. 228.

TFO Ploch testified that in an effort to be efficient and start "documenting evidence and what we had done so far while it's fresh in my head . . .", TFO Ploch began processing the items of evidentiary value found in the backpack and on defendant's person and listed them in a FD-1087, or "Collected Item Log" form. App. 272-73; 275; R. 18-4. In another report form, FD-1036 titled "Fillyaw Arrest / Search Warrant report," TFO Ploch also provided a narrative of the arrest, evidence collected from the backpack, and evidence collected from the search warrant conducted at the defendant's apartment. App. 273; R. 18-5. TFO Ploch testified regarding his intention when he searched the backpack:

> To make sure that there was nothing dangerous in that . . . backpack, no firearms, knives, bombs, fentanyl, dangerous anything, or anything that could help him escape while we have to transport Mr. Fillyaw and also to make sure that I'm not going to bring a firearm or some dangerous substance into his next stop which at that time was the marshals.

App. 275-76. TFO Ploch confirmed that he was not looking for evidence of the arson, or specifically searching for contraband because he had received no intelligence reporting that defendant was armed or had drugs. App. 276-77.

In describing the inventory search that occurred, SA Dettmering similarly explained that the purpose behind an inventory search is to

document the items that are contained within the property, and for safety reasons when that property is transported to a police department or the FBI building. App. 218. In explaining the safety reasoning, SA Dettmering stated, "I don't know if there's a bomb in there or some sort of device that could hurt us or drugs or something like that." *Id.* SA Dettmering also stated that it is proper to conduct an inventory search prior to bringing the bag in the transport vehicle because "[i]t's necessary to make sure that you are not putting dangerous items within the vehicle in which you're going to transport it with human beings." App. 218. Consistent with this reasoning, TFO Ploch testified that the reason he opened the backpack was to "make sure there was nothing in that backpack that could harm us, whether that be him using it to harm us, him using it to somehow escape from our custody, or something in there that was dangerous or potentially dangerous without him even having to use it such as fentanyl or something like that." App. 264. TFO Ploch also testified that the other reason the backpack was searched was because when they bring an arrestee to a secure facility, and would not want to introduce, for example, guns or drugs into a facility due to the safety risks. App. 265-65.

During the suppression hearing, SA Dettmering was asked about whether he could have retrieved a search warrant for the backpack. SA Dettmering testified as to his belief that there was probable cause to search the backpack (App. 242), but as for the feasibility of obtaining a search warrant

prior to an inventory search, he stated, "At the time, no. We could have followed up with a search warrant, but [the backpack] was going to be transported away and we're not going to not inventory search it before we take it." App. 245. In a follow-up asking whether SA Dettmering could have left the backpack on the ground and obtained a search warrant with agents looking over it, SA Dettmering responded, "At the time we didn't know if we were going to stay or go, so the property was going with him for his arrest." *Id.* With respect to the question of whether law enforcement intended to get into the backpack, SA Dettmering testified that there was no plan in place to conduct a search during the arrest and that in fact, they did not even bring a search kit to the arrest. App. 250.

During the suppression hearing, SA Dettmering, TFO Ploch, and defendant's significant other Sabrina Lynch, all testified about the availability of alternative dispositions for the backpack.

Specifically, SA Dettmering testified that the defendant was alone at the time of the arrest, that no one came to the parking lot and identified themselves as knowing defendant, and that defendant refused to give any information about who he knew in the apartment complex. App. 225-26; 272. For example, when SA Dettmering was asked why he didn't turn the backpack over to defendant's girlfriend or someone who could take it away, he explained that "[t]here was no one present at the time, so there's no one to give it to"

(App. 240) and "I had no one that he gave – he gave us no information on anyone to give it to. So in our policy, we take it and it goes with the arrestee." App. 247.

SA Dettmering and TFO Ploch testified that they did not see defendant's significant other at any point prior to defendant's transport. App. 240; 271. SA Dettmering testified that law enforcement provided defendant with multiple opportunities to identify where his girlfriend lived in the apartment complex, but that he refused to provide that information. App. 227. SA Dettmering further testified that defendant never asked him or other law enforcement officers to provide the backpack to anyone else. App. 229. In one instance, SA Dettmering testified about a line of questioning with the defendant regarding the backpack, which was captured on body-worn camera. App. 252. During the exchange, defendant asked law enforcement about the process of *defendant* retrieving his IDs and bank cards that were in his backpack; defendant did not ask for the backpack to be given to anyone, and did not identify a specific person who could take possession of the backpack from law enforcement. App. 252.

Defendant's significant other, Sabrina Lynch, testified at the suppression hearing. App. 285. Ms. Lynch testified that she observed defendant's arrest standing near a light pole in the back portion of the parking lot by a trail. App. 291-293; 295. In reviewing body-worn camera from

defendant's arrest, Ms. Lynch was unable to identify herself on the video. App. 293. Although Ms. Lynch observed the entirety of defendant's arrest, which took approximately 20 minutes, Ms. Lynch testified that she did not speak to any of the agents, did not identify herself to anyone from law enforcement, did not make herself physically known, did not intervene in any way, did not try to retrieve the backpack or ask anyone if she could take the property, and did not try to speak to defendant. App. 294-297.

SA Dettmering testified that for safety and efficiency reasons, they did not wait to try and find defendant's significant other because law enforcement would not delay transport of an arrestee with a warrant to find "somebody that may or may not be there." App. 228. According to SA Dettmering, defendant was unwilling to confirm even who lived in the apartment complex. App. 224. Furthermore, SA Dettmering testified it was not until approximately 35 minutes after defendant was transported that law enforcement was able to identify the door of Ms. Lynch's apartment, after utilizing the apartment manager and video camera system. App. 230. It was also not until much later that law enforcement encountered defendant's significant other, after defendant and his backpack had already been transported from the parking lot. App. 231. SA Dettmering confirmed that law enforcement did not identify anyone in the area who could take possession of defendant's backpack. App. 229.

SA Dettmering and TFO Ploch also testified at the suppression hearing about the FBI's protocol and process for seizures and inventory searches. Specifically, SA Dettmering testified that he is familiar with the FBI's Domestic Investigations and Operations Guide (DIOG) on inventory searches, which mandates that the agents must have gained possession of the property lawfully before conducting an inventory search, as well as the policy on searching a subject's belongings pursuant to an inventory search. App. 217; 237. The FBI DIOG "Inventory of Personal Property" policy sets forth criteria encompassing the seizure and inventory process. R. 18-1. Specifically, the policy outlines the following scenarios where seizures may occur: "Arrested subjects often have purses, shoulder bags, suitcases, vehicles, or other personal property capable of containing objects in their possession during an arrest. An inventory of personal property ensures the safekeeping of the property belonging to an arrested subject." *Id.* The FBI DIOG then goes on to state that "As a threshold matter, in order for an inventory search to be valid, agents must have gained possession of the property lawfully." The DIOG then goes on to reiterate this point, stating that "As a general rule, after lawfully taking custody of property, FBI employees must conduct a prompt and thorough search of the contents of the property, including searching any locked or unlocked containers and inventorying their contents. A written summary of

the inventory must be recorded in an FD-302, an FD-597 ('Receipt for Property'), or an FD-653 ('Motor Vehicle Inspection Inventory Record')." *Id.*

SA Dettmering and TFO Ploch were both questioned on this policy and explained that normal FBI policy was followed in this case with respect to the seizure and inventory search. Specifically, SA Dettmering stated, "The backpack was going to be transported with the arrestee which is normal policy for us and we would inventory search it before it gets transported." App. 246. When asked why law enforcement did not simply leave the backpack in the parking lot, SA Dettmering testified that he took the backpack consistent with FBI policy because there was no reasonable alternative person to give it to, stating, "I had no one that he gave – he gave us no information on anyone to give it to. So in our policy, we take it and it goes with the arrestee." App. 247. TFO Ploch also testified consistent with SA Dettmering, stating that he had the backpack in his possession because he was bringing it to be transported with defendant back to Wisconsin to fulfill the arrest warrant, and that he did not observe defendant's significant other, or anyone available to take defendant's backpack at any time prior to him opening the backpack, stating "There was nobody around that we would have given that backpack to at that time." App 263-64. TFO Ploch also testified that he participated in at least 50 arrests as an FBI TFO, and that he had followed that same protocol previously when conducting arrest warrants. App. 265.

Specifically with respect to the FBI DIOG guidance that an inventory summary be prepared on a FD-302, FD-597, or FD-653, TFO Ploch explained that he didn't have access to an FBI report-writing system at the time, and was only carrying his Cudahy Police Department laptop with him. App. 275; R. 18-1. TFO Ploch further explained that when he used the term "[s]earch incident to arrest" in his "Fillyaw Arrest / Search Warrant report", he was writing the report to remember the arrest events and what he did that day. App. 275.

Finally, with respect to the FBI DIOG requirement regarding conducting an inventory search alone or with others, SA Dettmering testified that the protocol requires that, when practicable, an inventory search should be done with others "if there's a substantial monetary value of it[.]" App. 238; R. 18-1 ("Where practicable, the inventory should be conducted by two agents/officers, particularly when dealing with property of significant monetary value (e.g. money, jewelry, electronics, vehicles, etc.")).

***District Court's Denial of Motion to Suppress***

At the conclusion of the suppression hearing, the district court orally denied defendant's motion to suppress. App. 319-324. The court held the search of the backpack was a "valid inventory search" as it was "reasonable for the arresting officers to impound the backpack and do an inventory search." App. 320-21. The court explained that it was "proper for police to remove or enlist or inventory in the possession of an arrested person" and that the search is

lawful if, as it was here, "conducted as part of a routine procedure that's incident to incarcerating an arrested person in accordance with established procedures." App. 321.

The court explained that any deviations from the FBI protocol were minor. App. 321-22. The search being conducted by one officer instead of two was "an immaterial, minor deviation" and two officers is not "mandated at all by the Fourth Amendment." *Id*. Nor was it improper for TFO Ploch to "focus[]" on locating firearms or contraband, because it was "legitimate" for officers to search to see if "there was anything potentially dangerous" in the backpack before they transported it. *Id*. at 322.

The court further found that "Ms. Lynch didn't identify herself or make her presence known." App. 323. The court said it was "not clear" when she "arrived [in the parking lot] and when she left" but there was "no indication" that the officers "noticed anybody standing over there at all, assuming there was anybody there to begin with." App. 322-23. Further, "[t]here's no basis in the evidence to say the agents should have somehow identified her or given the backpack to her" and they had no "affirmative duty" under the law to try to find someone to leave the backpack with. App. 323.

Finally, the court found, in the alternative, that even if there was a "technical defect" with the inventory search, there's "no question an inventory search" would have been done after defendant was transported to the police

station, and there was "no basis" to leave the backpack on the scene. App. 323-324.

***Motion to Reconsider***

Following the suppression hearing, defendant filed a motion to reconsider the denial of the suppression motion. Defendant argued that the district court misconstrued the legal standards for impoundment, and sought to "clarify the law and challenge the arbitrary impoundment of the backpack under the presumed authority the backpack could be seized prior to an inventory search." App. 107. Specifically, defendant argued that the FBI's impoundment of defendant's backpack was not pursuant to standardized procedures, and that alternatives to seizure existed, which law enforcement failed to pursue. App. 108; 111.

The district court orally denied defendant's motion for reconsideration. App. 329-336. The court explained that the motion "largely argues that [the court] made incorrect decisions" but that "saying the judge got it wrong is not really a basis for a motion for reconsideration." App. 331.

The court disputed defendant's claim that there was a "readily available and reasonably available alternative" to dispose of the backpack other than impoundment, since defendant's girlfriend "didn't make herself known." App. 332. The court also said that, contrary to defendant's argument, law enforcement as not "required" to go to the apartment management office and

ask them to take the backpack. *Id.* The court denied defendant's motion for reconsideration. *Id.*

***Guilty Plea and Sentencing***

On February 14, 2025, defendant pled guilty to Counts One and Two of the indictment pursuant to a written plea agreement. R. 50. The district court sentenced defendant on May 9, 2025 to a total of 144 months' incarceration: 84 months as to Count One and 60 months as to Count Two, to run consecutively. R. 59.

## SUMMARY OF ARGUMENT

The district court did not err when denying defendant's motion to suppress. The district court did not clearly err in concluding that law enforcement followed standard impoundment and inventory search procedures, and it was reasonable for law enforcement to impound the backpack and conduct an inventory search, to facilitate transport of the backpack with defendant to the next processing location.

Furthermore, district court did not abuse its discretion in denying defendant's motion for reconsideration. The district court's denial of defendant's motion for reconsideration was the product of the district court's well-reasoned and careful analysis of the facts and law, and did not misapply circuit precedent.

Finally, defendant has waived a suppression argument raised for the first time on appeal: that law enforcement conducted an unlawful search of a license plate reader database in violation of the Fourth Amendment. Waiver precludes appellate review.

The judgment of the district court should be affirmed.

## ARGUMENT

### I. The District Court Did Not Err in Denying Defendant's Motion to Suppress.

#### A. Standard of Review

When reviewing the denial of a motion to suppress, this Court reviews legal conclusions *de novo* and factual findings for clear error. *United States v. Jones*, 22 F. 4th 667, 673 (7th Cir. 2022). In the context of an inventory search, this Court reviews "for clear error a district court's conclusion that the police followed standard impoundment procedures" but the review of the "reasonableness of the inventory search and seizure is plenary." *United States v. Cartwright*, 630 F.3d 610, 613 (7th Cir. 2010). "Given the fact-specific nature of motions to suppress, 'reviewing courts give special deference to the trial court that heard the testimony and had the best opportunity to observe the witnesses at the suppression hearing.'" *United States v. Jackson*, 300 F.3d 740, 745 (7th Cir. 2002) (quoting *United States v. French*, 291 F.3d 945, 951 (7th Cir. 2002)).

### B. Analysis

#### i. Law Enforcement Reasonably Impounded Defendant's Backpack Pursuant to Public Safety and Community Caretaking Considerations, and Because There Was No Alternative Opportunity for Its Speedy and Efficient Removal.

The district court did not err in determining that law enforcement properly impounded defendant's backpack after he was arrested. When assessing law enforcement's seizure of property, the decision to seize, or impound property "must meet the strictures" of the Fourth Amendment's reasonableness requirement. *United States v. Duguay*, 93 F.3d 346, 351 (7th Cir. 1996).

In *United States v. Duguay*, 93 F.3d 346 (7th Cir. 1996) and *United States v. Cartwright*, 630 F.3d 610 (7th Cir. 2010), this Court set forth its impoundment analysis in the context of vehicular impoundment. Specifically, there must be a standardized criteria or established routine that regulates impoundment, and law enforcement may, in the absence of probable cause, impound vehicles in furtherance of "public safety" or "community caretaking functions." *Duguay*, 93 F.3d at 352. Furthermore, this Court concluded that the decision to impound a vehicle for community caretaking or public safety reasons is valid only "if the arrestee is otherwise unable to provide for the speedy and efficient removal of the car from public thoroughfares or parking lots." *Duguay*, 93 F.3d at 353.

With respect to the requirement of standardized criteria or an established routine, this Court has stated that the existence and following of an impoundment policy, while an important fact, "is not dispositive for purposes of the Fourth Amendment" analysis. *Cartwright*, 630 F.3d at 614. In concluding that the "lack of a written policy . . . is not dispositive," this Court further noted that the Supreme Court emphasized, "[s]tandardized criteria or established routine . . . suggesting that a well-honed department routine may be sufficient." *Florida v. Wells*, 495 U.S. 1, 3 (1990). The district court did not clearly err in finding that law enforcement here followed established FBI policies and routines. SA Dettmering and TFO Ploch both testified at the suppression hearing that in defendant's case, and in their other investigations, they follow a standard set of criteria and established routine with respect to seizure of personal property.

Specifically, both SA Dettmering and TFO Ploch testified that normal FBI policies and procedures were followed, including that personal property in the possession of an arrestee, such as a backpack, is to be transported with the arrestee, with an inventory search prior to transport for safety. TFO Ploch's testimony underscored the consistency with those practices: that in his approximately 50 arrests as a FBI TFO, he follows the same protocol – specifically, that he was bringing the backpack to be transported with

defendant back to Wisconsin to fulfill the arrest warrant, and that he did not observe anyone else available to take the backpack. App. 263-65.

The instant case is distinguishable from this Court's conclusion in *Duguay*, where this Court concluded that the Alton Police Department's impoundment protocol was insufficient. In *Duguay*, this Court concluded that it was unconvinced the Alton Police Department employed a standardized impoundment procedure, primarily focusing on the fact that the two testifying officers had inconsistent understandings of the department's policy on impoundment and that in any event, the steps taken were unreasonable because they failed to take into account "whether the defendant can provide for its removal." *Duguay*, 93 F.3d at 353. That is not the case here. Not only is impoundment described within the FBI DIOG Inventory Policy, but both TFO Ploch and SA Dettmering testified in a consistent manner regarding the steps for the FBI's impoundment protocol in these circumstances, and the lack of available alternatives.

In addition to a standardized criteria or established routine, this Court further requires that "[a]n impoundment is permissible so long as it is supported by probable cause or is in "furtherance of 'public safety' or 'community caretaking functions[.]" *United States v. Duguay,* 93 F.3d 346, 352 (7th Cir. 1996). In the context of vehicles, community caretaking impounds include removing "disabled or damaged vehicles" and "automobiles which

violate parking ordinances, which thereby jeopardize the public safety and the efficient movement of vehicular traffic." *Id.*

Impoundment of the backpack furthered both public safety and community caretaking goals. Upon defendant's arrest, the plan was to transport him immediately to the next stage of proceedings. As SA Dettmering testified, there was no one to give the property to, "so in our policy, we take it and it goes with the arrestee." App. 247. Without law enforcement intervention, defendant's backpack was set to be abandoned in the middle of an apartment complex's open-air parking lot. As the district court correctly concluded in explaining why it was reasonable for the arresting officers to impound the backpack, "I don't think it would be reasonable to expect the officers to have just left the property there." App. 322.

The Seventh Circuit shed light on the subject in *United States v. Cartwright*, 630 F.3d 610 (7th Cir. 2010). There, the police pulled over a car for a traffic violation, and the driver pulled into a grocery store parking lot, but stopped the car between two rows of parking spaces, not fully in a parking spot. *Id.* at 612. The police were not "obliged to leave the car where it was – stopped between two rows of parking spaces – as this may have created a hazard to others using the lot or rendered the police vulnerable to claims had the car been stolen, vandalized, or damaged." *Id.* at 615 n.1; *see also id.* (citing a district court opinion for the notion that the police may "need to impound a

vehicle for the purpose of protecting it after the arrest of the driver, even when the vehicle was parked in a private lot"). The same community caretaking and public safety concerns that were present in *Cartwright* exist in the instant case, namely, that the property was on a private business' parking lot accessible to the public, and abandoning the backpack – with the possibility of weapons, drugs, ammunition, or other dangerous contraband inside – could have created a hazard to others in the lot, or rendered the police subject to claims that the backpack was stolen or damaged.

If anything, the community caretaking concerns are amplified when the seized items are unlocked and unsecured, where any member of the public could access the contents. Unlike a vehicle, it would be unreasonable to simply leave an item like a backpack in an outdoor, publicly accessible location. The items found within defendant's backpack – drugs and a gun – underscore the dangers and harm that could occur if an unsuspecting member of the public, including a child, encountered the backpack abandoned in the parking lot following an arrest. *See, e.g., United States v. Braxton*, 61 F.4th 830, 835 (10th Cir. 2023) ("[T]he officers obviously could not have left the backpack on the sidewalk."); *United States v. Perea*, 986 F.2d 633, 643 (2d Cir. 1993) ("When a person is arrested in a place other than his home, the arresting officers may 'impound the personal effects that are with him at the time to ensure the safety of those effects or to remove nuisances from the area.'") (internal citations

omitted); *Cabbler v. Superintendent, Virginia State Penitentiary*, 528 F.2d 1142, 1145 (4th Cir 1975) ("As the district court observed, 'it would be anomalous to find that the Fourth Amendment, designed to insure the sanctity of private possessions, compelled the police to leave the personal effects of a prisoner . . . scattered in the street…'" (Omissions in original.).

Nor is law enforcement required to search for an alternative to impoundment if one is not readily available. *See United States v. Vick*, 145 F.4th 191, 198 (1st Cir. 2025) ("[O]fficers [are] not constitutionally required to select the least intrusive – or most optimal – way of fulfilling their community caretaking responsibilities." (internal quotation marks and citations omitted)). TFO Ploch and SA Dettmering both testified that they were unaware of anyone available to take the backpack for defendant. Although defendant's significant other testified that she was on the scene throughout the arrest, she also testified that she did not make herself known, did not ask for the backpack, and did not interact with law enforcement. App. 294-297. As the district court correctly concluded, "There's no basis in the evidence to say that the agents should have somehow identified her or given the backpack to her." App. 323. If someone was with defendant that morning, or if he had otherwise identified someone to give the backpack to, SA Dettmering testified that it's possible he could have provided them with the backpack. App. 228. But, that was simply not the case here and furthermore, defendant never suggested that he leave

the backpack with anybody, including his significant other, management, or a vehicle, and it is not incumbent upon law enforcement to explore those alternatives.[3] *Cartwright*, 630 F.3d at 615 n.1 ("At oral argument, Cartwright's lawyer advised that the grocery store permitted abandoned vehicles to remain in the parking lot for seventy-two hours, possibly enough time for Golliday to find a licensed driver or fix the license plate lamp. However, the Fourth Amendment did not require the officers to explore such alternatives with the store owner.").

The circumstances here consistent with the ones confronted by this Court in *United States v. Cartwright*, 630 F.3d 610 (7th Cir. 2010). In *Cartwright*, the driver had no means of ensuring the "speedy and efficient" removal of her vehicle from the parking lot, and although she "called 'someone' to come and pick up the car . . . she never identified that person or stated how long it would have taken him/her to get there." *Id.* at 615. This Court noted that the record contained no evidence that other individuals were "present and willing to assume responsibility for the car." *Id.* Although the driver stated that "she would have allowed anyone, even a licensed stranger, to move the car,", this Court concluded that "[t]he Fourth Amendment does not require that

[3] There was no evidence introduced regarding defendant's argument that other alternatives for the backpack existed "such as placing the backpack back in the maroon van or bringing it to the management office of the apartment complex." Br. 24.

the police offer these sorts of alternatives to impoundment." *Id.; See Colorado v. Bertine,* 479 U.S. 367, 373–74, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987) (holding that the police need not give a motorist "an opportunity to make alternative arrangements" that avoid impoundment and inventory); *United States v. Clinton,* 591 F.3d 968, 972 (7th Cir. 2010) ("That Clinton's girlfriend, the owner of the car, could have been called to take possession of the car, is irrelevant."); *United States v. Cherry,* 436 F.3d 769, 775 (7th Cir. 2006) (stating that officers need not invite or accept input from the motorist as to the appropriate disposition of his vehicle; "nor does the Fourth Amendment demand that police offer a motorist an alternative means of removing his vehicle that will avoid the need to tow it and conduct an inventory search").

Defendant relies on two cases from the Tenth Circuit, *United States v. Sanders*, 796 F.3d 1231 (10th Cir. 2015) and *United States v. Braxton*, 61 F.4th 830 (10th Cir. 2023), which address a non-exclusive list of facts for assessing whether the community caretaking rationale applies to the impoundment of a vehicle:

> (1) whether the vehicle is on public or private property; (2) if on private property, whether the property owner has been consulted; (3) whether an alternative to impoundment exists (especially another person capable of driving the vehicle); (4) whether the vehicle is implicated in a crime; and (5) whether the vehicle's owner and/or driver have consented to the impoundment.

*Sanders*, 796 F.3d at 1250. The Seventh Circuit has not adopted the Tenth Circuit's factors, and some of the factors are in tension with this Court's precedents. Defendant's proposal of nonbinding precedent notwithstanding, an application of the *Sanders* factors do not require reversal.

As to the first *Sanders* factor regarding public or private property, while defendant's property was on private property, it was an open-air apartment complex parking lot where both the complex residents and the public had easy access. "The community caretaking rationale applies well to communal space, like a public street or private property that is open to the public (*e.g.*, a parking lot of a business)." *United States v. Black*, 2023 WL 5934911 at *8 (N.D. Ill. Sep. 12, 2023). In a quasi-public location like an open-air apartment complex parking lot, this factor weights in favor of the reasonable community-caretaking rationale for impoundment because it was not reasonable for officers to simply leave the backpack on a sidewalk or parking lot. *See Braxton*, 61 F.4th at 835 ("Braxton concedes that this fact would weigh in favor of a reasonable community-caretaking rationale for impoundment because the officers obviously could not have left the backpack on the sidewalk.").

With respect to the second *Sanders* factor – whether the owner of private property has been consulted – Seventh Circuit precedent does not require such a step by law enforcement. *See Cartwright*, 630 F.3d at 615 n.1 ("At oral argument, Cartwright's lawyer advised that the grocery store permitted

abandoned vehicles to remain in the parking lot for seventy-two hours. . . However, the Fourth Amendment did not require the officers to explore such alternatives with the store owner."). In any event, law enforcement testified that they planned to move defendant quickly to fulfill the arrest warrant, and did not have time to run down all possible avenues for who could obtain the backpack. App. 222 (SA Dettmering testifying at the suppression hearing that he planned to transport defendant "[a]s soon as possible" after the arrest so that "he could see the judge that day and get his appearance."); *see also id.* at 240 (SA Dettmering testifying that "[t]here was no one present at the time, so there's no one to give it [the backpack] to.")

The third criteria – whether an alternative to impoundment existed – does overlap with the Seventh Circuit's impoundment analysis. In *Cartwright*, this Court held that where no individuals were present and willing to assume responsibility for the car, "[t]he Fourth Amendment does not require that the police offer these sorts of alternatives to impoundment." 630 F.3d at 615; *see also Duguay*, 93 F.3d at 353 (finding that impoundment of a vehicle is only valid, in the absence of probable cause, "if the arrestee is otherwise unable to provide for the speedy and efficient removal of the car from public thoroughfares or parking lots."); *United States v. Clinton,* 591 F.3d 968, 972 (7th Cir. 2010) ("That Clinton's girlfriend, the owner of the car, could have been called to take possession of the car, is irrelevant."). As detailed above, the

record is clear that there was no viable alternative to impoundment that would have allowed for the speedy and efficient removal of defendant's backpack, and simply leaving the backpack in the parking lot, as defendant suggests, is neither a rational nor a reasonable option. Furthermore in *United States v. Braxton*, where the Tenth Circuit found that there *was* a reasonable alternative, those facts are materially different than defendant's: in *Braxton*, the defendant called over for his "girl", who approached in less than a minute. *Braxton*, 61 F.4th at 836. Both defendant and his "girl" repeatedly asked that the officers give her the backpack, and the officers rejected the requests. *Id.* Here, the district court did not clearly err in finding that defendant's girlfriend did not make herself known, and the officers were not aware of her presence.

On the fourth and fifth factors, here, defendant concedes the backpack seizure was premised on a non-investigative purpose, Br. 18, and during the arrest, defendant did not raise or suggest any course of conduct other than law enforcement's seizure of the backpack. *See* App. 229 (Dettmering testified that defendant never asked him or other law enforcement officers to provide the backpack to anyone else.).

**ii. The Inventory Search Was Reasonable, Substantially Consistent with FBI Policy, and Not Done in Bad Faith.**

Following the seizure of Fillyaw's backpack, law enforcement conducted an inventory search of the bag on scene. The inventory search was

substantially in compliance with FBI policy, did not deviate in any material way, and was not done in bad faith.

The Fourth Amendment prohibits "unreasonable searches and seizures" without warrants. U.S. Const. amend. IV. Inventory searches "constitute a well-recognized exception to the warrant requirement and are reasonable under the Fourth Amendment." *Cartwright*, 630 F.3d at 613 (7th Cir. 2010) (citing *South Dakota v. Opperman*, 428 U.S. 364, 376 (1976)). "[I]t is entirely proper for police to remove and list or inventory property found on the person or in the possession of an arrested person who is to be jailed." *Illinois v. Lafayette*, 462 U.S. 640, 646 (1983). Warrantless inventory searches may be conducted in order to protect the owner's property while that property is in police custody, protect the police against claims of lost or stolen property, or protect the police from potential danger posed by the property. *Colorado v. Bertine*, 479 U.S. 367, 372 (1987).

To be sure, inventory searches are not an invitation "for a general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U.S. 1, 4 (1990). Instead, officers must conduct an inventory search pursuant to an established procedure; "[r]equiring sufficient regulation of inventory searches ensures that a police procedure is not merely a pretext for concealing an investigatory police motive." *United States v. Lomeli*, 76 F.3d 146, 148 (7th Cir. 1996) (citing *South Dakota v. Opperman*, 428 U.S. 364, 376 (1976)).

"An inventory search is lawful if: (1) the individual whose possession is to be searched has been lawfully arrested, and (2) the search is conducted as part of the routine procedure incident to incarcerating an arrested person and in accordance with established inventory procedures." *Cartwright*, 630 F.3d at 613 (citing *United States v. Jackson*, 189 F.3d 502, 508-09 (7th Cir. 1999)).

Both elements were met here. First, the defendant was lawfully arrested pursuant to an arrest warrant and complaint signed by a federal magistrate judge in the Eastern District of Wisconsin. R. 23. After the defendant's arrest, law enforcement lawfully seized his backpack, as described further above.

Second, law enforcement's actions were consistent with the written inventory protocol set forth in the FBI's DIOG. The DIOG's "Inventory of Personal Property" guidance requires that "[a]s a general rule", after lawfully taking custody of property, FBI employees must promptly search and inventory the contents of the property, and a written summary of the inventory must be recorded in a FD-302, an FD-597 ('Receipt for Property'), or an FD-653 ('Motor Vehicle Inspection Inventory Record')." R. 18-1.

Here, after defendant's arrest but prior to his transport, TFO Ploch opened defendant's backpack. TFO Ploch testified at the suppression hearing that he opened the backpack to ensure that no dangerous items needed to be secured prior to transporting the backpack. App. 264; *Bertine*, 479 U.S. at 372 ("[G]uarding the police from danger" is one of the strong governmental

interests underpinning the inventory search doctrine); *see also Lafayette*, 462 U.S. at 646 ("Dangerous instrumentalities—such as razor blades, bombs, or weapons—can be concealed in innocent-looking articles taken from the arrestee's possession."). As the Supreme Court concluded, "[e]xamining all the items removed from the arrestee's person or possession and listing or inventorying them is an entirely reasonable administrative procedure. It is immaterial whether the police actually fear any particular package or container; the need to protect against such risks arises independent of a particular officer's subjective concerns." *Lafayette*, 462 U.S. at 646.

TFO Ploch's actions were precisely aligned with one of the enumerated factors for an inventory search: to protect law enforcement from potential danger. *Bertine*, 479 U.S. at 372-73 (finding that knowledge of the precise nature of the property "helped to avert any danger to police or others that may have been posed by the property."). TFO Ploch's actions were also consistent with how other FBI employees implement the DIOG relating to inventory searches. *See, e.g. United States v. Isaac Mallory*, 19 CR 857 (NSR), Dkt. 121 (S.D.N.Y. 2020) (government detailing an arrest conducted by FBI consistent with the DIOG and stating that, "Prior to transporting the bag, law enforcement opened it, following normal practice, to ensure that no dangerous items needed to be secured prior to transporting the bag.").

The guidance set forth in the DIOG was substantially complied with here. TFO Ploch and TFO Kazachenko promptly catalogued items found in defendant's possession during his arrest. Items in the backpack – including not just the narcotics and firearm, but also bank cards, identification cards, U.S. currency, the backpack itself, and a piece of mail – were photographed and documented in a FBI photograph log. R. 18-2; R. 18-3. As described above, TFO Ploch documented items of evidentiary value located on the defendant's person and in his backpack in a FD-1087, or a "Collected Item Log", as well as provided a narrative and summary of the evidence in a report FD-1036 titled "Fillyaw Arrest / Search Warrant report". R. 18-4; R. 18-5. The course of events detailed above reflect the concerted effort by law enforcement to carefully review and document items from the backpack in a prompt manner.

While defendant argues that there were six substantial deviations from the FBI's policy (Br. 25), there was, in fact, only one inconsequential deviation from the DIOG: that law enforcement failed to file the proper forms in an inventory search by not preparing a written summary of every item in a FD-302, FD-597, or FD-654. To be sure, this is not a scenario is which *no* written summary was prepared; instead, the written summary was simply preserved in a FD-1087, FD-1036, and FD-674 instead of, as detailed in the FBI DIOG, a FD-302, FD-597, or FD-654. And as defendant concedes, "not filling out a complete inventory form will not render the search unreasonable." Br. 25. As

this Court has held, "minor deviations from department policy do not render an inventory search unreasonable." *Cartwright*, 630 F.3d at 616 (citing *United States v. Lomeli*, 76 F.3d 146, 148–49 (7th Cir. 1996)). Across three separate documents, TFO Ploch made sure to carefully document and assess each of the items that were recovered and what occurred. There was no substantial deviation here. Although the report names are different, the substance of the inventory procedures – which is designed to ensure a full accounting of the events and collected items – was complied with.

Defendant's five other deviations are unavailing. Defendant's first substantial deviation is simply that there were "individual and cumulative deviations", which is unsupported by the evidence and not, by itself, a separate substantial deviation. Br. 23. Defendant's second substantial deviation is that the agents did not gain possession of the properly lawfully, which is incorrect. Br. 24. The FBI DIOG requires that the agents must have gained possession of the property lawfully, and that element is met here: as detailed above, the agents properly seized defendant's backpack during the course of his arrest. Defendant's third remaining substantial deviation is that agents are required to memorialize facts pertinent to other activities undertaken during the inventory process, and that the memorialized facts do not support an inventory search. Br. 25. With respect to what agents are required to memorialize, the actual language of the FBI DIOG states as follows:

> Agents must provide receipts for all items retrieved during inventory searches. *Agents should also memorialize facts pertinent to other activities undertaken during the inventory process, such as* an interview (i.e., FD-302), or a non-inventory-related search conducted and any evidence collected (i.e., FD-1087, "Collected Evidence Log" [Sentinel]) that are relevant to the investigation.

R. 18-1 (emphasis added). That is precisely what TFO Ploch did in his FD-1036 ("Fillyaw Arrest / Search Warrant report") and FD-1087 ("Collected Item Log"). In particular, the FD-1036 not only details the inventory search, but also discusses the operation as a whole regarding Fillyaw, the surveillance and arrest process, and other activities undertaken by team members. *See* R. 18-5 ("SA Dettmering began drafting search warrants for the two vans and Fillyaw's apartment which was identified by management as unit #410.").

TFO Ploch wrote in the narrative report of the FD-1036 about his retrieval of the backpack, and that he opened it in a "search incident to arrest." *Id.* Although this specific verbiage used by TFO Ploch implicates a separate legal analysis, TFO Ploch testified that his intention behind opening the backpack was consistent with an inventory search: namely, that he searched the bag to ensure that nothing in the defendant's property could be dangerous to the law enforcement agents who would be transporting the backpack to a secure facility. App. 275-76; 284. Furthermore, the defendant was arrested alone, and law enforcement was not going to leave his backpack, contents unknown, sitting in the middle of a residential parking lot. Based on this, TFO

Ploch testified that he knew that defendant's backpack would need to be transported in a vehicle with law enforcement, necessitating a review of the backpack's contents to ensure that defendant's property did not contain anything that could be a danger to law enforcement transporting it. App 263-64. This stated intention is squarely in line with the strong governmental interests behind the inventory search exception. *Bertine*, 479 U.S. at 372 ((“[G]uarding the police from danger” is one of the rationales underpinning the inventory search doctrine).

Defendant's fifth cited deviation is that the inventory search “should be conducted by two agents” but that TFO Ploch searched the bag by himself before being joined by TFO Boyd and others. Br. 26. However, as TFO Ploch testified, his understanding was that they were leaving to transport the defendant, and for that reason, he opened the bag to prepare for it to be transported. App. 263. TFO Ploch testified that as soon as he opened the backpack and observed the contraband, he immediately called TFO Boyd to bring her camera over “so we could document the evidence that I now saw in the backpack.” *Id.* TFO Ploch testified that when he opened the bag and had it by SA Dettmering's vehicle, TFO Kazachenko was there within “probably seconds.” *Id.* at 284. The FBI DIOG policy was complied with here, which states that, “*Where practicable*, the inventory *should be* conducted by two agents/officers, particularly when dealing with property of significant

monetary value (e.g. money, jewelry, electronics, vehicles, etc.).” (emphasis added). The DIOG policy does not create a bright line, mandatory rule that the inventory *must* be conducted by two agents, but instead states that it should be done in this manner “where practicable” and particularly when dealing with high net worth pieces of property. Not only was TFO Kazachenko involved in the inventory search within seconds of TFO Ploch opening the backpack, but TFO Ploch did not describe any reason to think that the defendant’s backpack would contain any items of “significant monetary value.” There was no deviation, much less a substantial one, here.

Finally, defendant argues that because SA Dettmering testified that he believed he had probable cause to get a warrant for the backpack if he wanted to, he was in violation of the FBI DIOG. Br. 27. The relevant portion of the FBI DIOG states the following with respect to this issue:

> Whenever there is probable cause to believe an inventory search would also yield items of evidence or contraband, agents must obtain a search warrant when feasible. Searches conducted pursuant to a warrant are presumptively valid. Obtaining a search warrant eliminates any later argument that the inventory search was conducted solely for investigative purposes and thus unjustified.

R. 18-1. The DIOG does not create a bright-line rule, and instead tells agents to obtain a search warrant “when feasible.” *Id.* After SA Dettmering expressed his belief that he had probable cause with respect to the backpack – which as defendant concedes, an agent’s individual assessment of probable

cause is not the same as a judicial finding (Br. 29) – SA Dettmering then testified that it was not practicable or feasible to obtain a warrant given that defendant was going to be transported "as soon as possible", and that the backpack would be coming with him because there was no alternative person to provide the backpack to. App. 221-22; 245. SA Dettmering further confirmed that there was no pretext to the inventory search because there had been no plan in place to search, as the law enforcement team had not even brought a search kit. App. 250. Moreover, the FBI DIOG states that the purpose of obtaining the search warrant can "eliminate any later argument that the inventory search was conducted solely for investigative purposes and thus unjustified." R. 18-1. Here, TFO Ploch, who actually opened the backpack, did not testify whether or not he believed there was probable cause for a warrant; he did, however, testify that he opened the backpack not for any investigative purpose, but solely for safety reasons and so they could efficiently transport the defendant following his arrest. Finally, the fact that SA Dettmering called the FBI DIOG "guidelines" is consistent with their name: the DIOG is the "Domestic Investigations and Operations *Guide*" (emphasis added) which, as apparent from the name alone, contains guidelines for FBI's domestic investigations and operations.

TFO Ploch's inventory search was not done in bad faith. TFO Ploch testified at length during the suppression hearing that he was not opening the

backpack to search for guns, drugs, or evidence of the crime in the complaint. App. 276-77. TFO Ploch testified that he used the term "search incident to arrest" to describe the post-arrest actions he took to ensure that the backpack was safe from dangerous weapons, explosives, or other harmful items before placing it in a law enforcement vehicle for transport. App. 276-76. Contrary to defendant's argument, TFO Ploch did not change his explanation for why he conducted the search the way he did, and because an officers' subjective motive for the search can be relevant in the context of inventory searches, TFO Ploch's intention behind opening the backpack further supports that the search of the defendant's backpack was a valid inventory search. *See, e.g. Whren v. United States*, 517 U.S. 806, 811-12 (1996) (noting that an officer's motive can be relevant in the context of inventory search). The fact that TFO Ploch initially opened the backpack without gloves on or a camera to document the items simply underlines the fact that he was not opening the bag for the purpose of searching for contraband or illegal items; otherwise, he surely would have anticipated that he would need a search kit, a camera, and gloves to document the findings. Instead, he was simply opening the backpack to ensure it was safe for transport consistent with FBI DIOG protocols that agents "must conduct a *prompt* and thorough search of the contents of the property…" R. 18-1 (emphasis added).

Finally, the district court concluded that even if it did not find the inventory search conducted by TFO Ploch was valid, the contraband would have been inevitably discovered. App. 323-24. Specifically, the district court concluded that even if there was some "technical defect in an inventory search, there's no question an inventory search would have been done once Mr. Fillyaw was taken to the police station or the U.S. Marshals Service and there's no basis to leave the backpack there." *Id.* Defendant does not attempt to refute this alternative finding in his brief.

## II. The District Court Did Not Abuse its Discretion in Denying Defendant's Motion to Reconsider.

### A. Standard of Review

The standard of review for a motion to reconsider is abuse of discretion, and this court "will not upset the district court's ruling absent a showing that no reasonable person could agree" with its decision. *United Central Bank v. KMWC 845, LLC,* 800 F.3d 307, 309 (7th Cir. 2015) (quotation marks and citation omitted).

### B. Analysis

Because defendant failed to meet its heavy burden on reconsideration, the district court properly denied defendant's motion for reconsideration. At the motion for reconsideration stage, the defendant both inappropriately

attempted to relitigate arguments that the district court properly rejected and attempted to argue new issues that defendant failed to previously raise.

With respect to the first category, motions for reconsideration are not appropriate vehicles to again advance arguments already rejected by the Court. "A motion for reconsideration performs a valuable function where the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." *Bank of Waunakee v. Rochester Cheese Sales, Inc.,* 906 F.2d 1185, 1191 (7th Cir.1990); *Russell v. Delco Remy Div. of General Motors Corp.,* 51 F.3d 746, 749 (7th Cir.1995) (a motion to reconsider must rely on newly discovered material evidence or a manifest error of law or fact). A motion to reconsider "is not an appropriate vehicle for relitigating arguments that the Court previously rejected or for arguing issues that could have been raised during the consideration of the motion presently under reconsideration." *F.D.I.C. v. Mahajan,* 2013 WL 3771419 at *2 (N.D. Ill. July 16, 2013). In his motion to reconsider, defendant argued the same factors at the suppression hearing and in his reply brief, and cited the same central cases – most of which are not binding precedent here – in support of its argument. *See, e.g. United States v. Sanders*, 796 F.3d 1241 (10th Cir. 2015) *and United States v. Braxton*, 61 F.4th 830 (10th Cir. 2023). Nothing about defendant's arguments regarding impoundment law was misunderstood by the district

court; instead, defendant takes issue with *how* the district court applied the facts to that law. And although defendant argues that the district court did not address the merits of the legal issues, that is simply not the case. The district court addressed defendant's legal arguments with specificity, providing a detailed analysis of how the district court distinguished the cases that defendant cited from the case at issue. For example, with respect to defendant's arguments regarding *Braxton*, the district court noted that *Braxton*:

> . . . [D]id involve a backpack of some sort, but in that case, another person, a girlfriend of the defendant approached the officers, asked for the backpack, so there was a readily available and reasonably available alternative. That was not the case here. Full stop. I addressed that in full in the ruling on the motion. The girlfriend in this situation wasn't – didn't make herself known. She may have walked by at a distance at some point, but she didn't make herself known, and there was no possibility – or no readily available possibility or probability for an alternative disposition of the backpack that was available the officers.

App. 332. As the district court explained, it had previously addressed these issues in full in the ruling on defendant's motion to suppress. A motion to reconsider should not treat judicial opinions as if they are briefs to which the parties are entitled to respond, *Burns v. First Am. Bank*, 2007 WL 141175, *1 (N.D. Ill. Jan. 12, 2007), nor are they opportunities to ask the district court to "think again about a matter to which [the] Court had given considered thought." *Central States, Southeast & Southwest Areas Pension Fund v. Reebie Storage & Moving Co., Inc.*, 1991 WL 105503, *2 (N.D. Ill. June 10,

1991) (further noting that such an argument "is not a proper predicate for [a motion for reconsideration], and that alone would [ ] justify its denial").

Furthermore, defendant raised for the first time in his motion to reconsider several arguments relating to potential viable alternatives to impoundment, none of which were raised in any of the briefings or at the hearing. R. 16; R. 31; App. 213-328. Specifically, defendant argues that an avenue for removal of the backpack was to leave the backpack at the management office or place the backpack in the maroon van. App. 112. No evidence was presented regarding these topics. App. 332. As such, a motion to reconsider was not an appropriate avenue to argue those issues, which were available to defense counsel and could have been raised during the suppression motion.

Because the standards for reconsideration are exacting, this Court has stressed that appropriate issues for reconsideration "rarely arise and the motion to reconsider should be equally rare." *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990). Defendant urged reconsideration on a number of grounds, none of which met the applicable burden, and the district court did not abuse its discretion in denying the motion.

## III. Defendant Waived the Argument that Law Enforcement Conducted an Unlawful Search of a License Plate Reader Database.

### A. Standard of Review

Where an argument is raised for the first time on appeal, the argument is either waived or forfeited. Waiver "occurs when a party intentionally relinquishes a known right." *United States v. Foy*, 50 F.4th 616, 625 (7th Cir. 2022). Waiver "extinguishes error and precludes appellate review." *Id.* "A defendant's decision to present one argument and not another is a matter of strategy, and the arguments he decides not to present are waived." *United States v. Scott*, 900 F.3d 972, 974-5 (7th Cir. 2018). On the other hand, "forfeiture arises when a party inadvertently fails to raise an argument in the district court." *Id.* Forfeited arguments are reviewed for plain error. *Id.*

### B. Analysis

"A defendant who moves to suppress evidence must 'identify the grounds upon which he believes suppression is warranted.'" *United States v. Wood*, 16 F.4th 529, 537 (7th Cir. 2021) (quoting *United States v. Kirkland*, 567 F.3d 316, 321 (7th Cir. 2009)).

Defendant now argues that law enforcement's use of a "commercial license plate reader" database to locate defendant's vehicle shortly before his August 2022 arrest violates the Fourth Amendment. Br. 34-35. However, in the district court, defendant filed a motion to suppress where he did not argue

that the search of Fillyaw's backpack flowed from an unlawful dragnet search of a "license plate reader" ("LPR") database, nor did the motion mention the license plate reader at all. R. 16; R. 31. Rather, the sole basis for defendant's motion to suppress in the district court related to the impoundment and inventory search of Fillyaw's backpack. R. 16; R. 31.

This Court has been clear that defendants may not raise new suppression arguments on appeal that were not made before the district court. *See United States v. Figueroa*, 622 F.3d 739, 742 (7th Cir. 2010) ("If a party filed a motion to suppress in the district court but raises new arguments for suppression on appeal . . . we review for plain error *if* the defendant can show good cause for failing to make those arguments in the district court." (emphasis added)). "This court 'has repeatedly held that there is no good cause to excuse a Rule 12 forfeiture where a defendant files a timely motion to suppress on one ground, and later seeks to assert a new ground for suppression for the first time on appeal.'" *United States v. McMillian*, 786 F.3d 630, 636 (7th Cir. 2015). As a result, the record is completely devoid of any evidence or argument related to the LPR issue that he seeks to advance now.[4]

[4] Defendant included in his Appendix several reports that were not presented to the district court during the suppression hearing, or at any other point during the proceedings, including the source of defendant's assertion that agents in Milwaukee utilized a license plate reader prior to defendant's arrest. (Br. 34 (citing App. 149)). The portions of the appendix that are not part of the record are App. 137-159; App. 160-207; App. 208-209; App. 210; App. 211; and App. 212. These items are not part of the district court record and should not be considered by this Court.

No good cause can be shown here. Defendant argues that counsel did not raise the issue below because "[c]ounsel relied upon the assertion in this case that the central issue was a search incident to arrest, as indicated in Ploch's police report." Br. 34. But the blame cannot be placed on an unidentified third party who "assert[ed]" what the "central issue" was in this case; rather, it was simply defense counsel's own assessment that determined which issues were "central" in the case and worthy of a suppression motion. It is incumbent on defense counsel to assess appropriate motions to bring based upon an analysis of the case and discovery. That defense counsel failed to do so here does not create good cause.

Defendant also argues that he raised facts regarding the LPR in the motion to reconsider and requested the proofs be reopened, "but the Court denied that requested relief." Br. 34-35. However, defendant made no arguments regarding the LPR issue in his motion to reconsider. Instead, defendant simply inserted facts in the motion to reconsider, unsupported by any evidence presented during the motion to suppress hearing or briefings, and untethered to any arguments regarding the LPR. Even if defendant could have properly raised an argument regarding the LPR in a motion to reconsider, he failed to do so.

Nor does timing related to the suppression motions create good cause. Defendant had ample opportunity to file any suppression motions it deemed

necessary. Defendant argues that because the judge set the case for trial, he did not have the opportunity to file a second motion to suppress on the LPR issue. Br. at 35. But this fails to establish good cause because the case had been open for almost a year at that point; defendant had the ability to file any suppression motions it deemed necessary. Defendant was indicted December 18, 2023, filed a motion to suppress on April 26, 2024, and a hearing on that motion was held on November 8, 2024. R. 1; R. 16; R. 41. Even after the court ruled on defendant's suppression motion on November 8, 2024, an additional 3 months passed before defendant pleaded guilty on February 14, 2025. R. 41; R. 50.

In fact, as the district court noted in overruling defendant's request to reopen proof on the impoundment issue in his motion for reconsideration, "Everybody had ample opportunity to marshal whatever evidence and bring it to court. I didn't limit anybody's presentation. There wasn't any kind of request at the hearing to, you know, leave the case open to – leave the motion open to continue additional evidence." App. 331. The same is true here. This Court should not permit defendant to advance the argument for the first time now.

When a defendant "fails to develop a suppression argument, he deprives the government of 'a meaningful opportunity to rebut [the defendant's] claims' and does not 'notify the district court that it needs to address them.'" *United States v. Wood*, 16 F.4th 529, 537 (7th Cir. 2021). Here, defendant's failure to

argue for suppression due to the use of the LPR resulted in a record devoid of any facts related to the LPR, how it functioned, how it was used, or any other details. Defendant cannot now request suppression with no supporting facts in the record. Defendant's suppression claims regarding the LPR are waived and should be dismissed by this Court.

## CONCLUSION

For the reasons set forth above, the judgment of the district court should be affirmed.

Respectfully submitted.

ANDREW S. BOUTROS
United States Attorney

MICHELLE PETERSEN
Assistant United States Attorney
Chief of Appeals, Criminal Division

/s/ *Kirsten Moran*
KIRSTEN MORAN
Assistant United States Attorney

## RULE 32 CERTIFICATION

I hereby certify that:

1. This brief complies with the type volume limitation of Federal Rules of Appellate Procedure 32(a)(7)(B) because it contains 11,443 words.

2. This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5), 32(a)(6), and Circuit Rule 32(b), because it has been prepared using the Microsoft Office Word proportionally-spaced typeface of Century Schoolbook with 13-point font in the text and 12-point font in the footnotes.

Respectfully submitted.

ANDREW S. BOUTROS
United States Attorney

By: /s/ *Kirsten Moran*
KIRSTEN MORAN
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 722-2291

**CERTIFICATE OF SERVICE**

I hereby certify that on January 16, 2026, I electronically filed the foregoing Brief of the United States with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Respectfully submitted.

By: /s/ *Kirsten Moran*

KIRSTEN MORAN
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 722-2291